UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BAYER CLOTHING GROUP, INC. ) | |
| ) | |
| Plaintiff, ) | 07CV2395 |
| ) | JUDGE DER-YEGHIAYAN |
| v. ) | MAG. JUDGE BROWN |
| ) | |
| SEARS, ROEBUCK and CO. ) | **JURY TRIAL DEMANDED** |
| ) | |
| Defendant. ) | |

## SEARS ROEBUCK AND CO.'S MEMORANDUM
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Bayer Clothing Group, Inc. ("Plaintiff"), a clothing manufacturer, claims that an October 14, 2004 document entitled "Projection" is a binding order for units of garments and that Sears breached its contract with Plaintiff by cancelling units set forth in the October 14, 2004 Projection. Plaintiff's claim is contrary to the express written terms of the contract whereby Plaintiff accepted the risk for any action it took based on projections. Plaintiff lacks any evidence and improperly argues to contradict—not supplement—the express written contract terms.

In addition, Plaintiff hasn't established any actual breach. The documents and deposition testimony establish that Sears took in all garments it had ordered. When the garment program proved unsuccessful, Sears worked with Plaintiff (Sears' long-time business partner) to reach a business resolution to wind down the program. In short, regardless of how the October 14, 2004 document is characterized (order or projection), the parties modified their obligations as part of that business resolution.

## INTRODUCTION

Prior to 2004, Plaintiff, a tailored clothing manufacturer, and Sears had worked together on tailored clothing programs before joining together on the rollout of a new program, the Structure Suit Separates Program ("New Structure Program"). However, the New Structure Program involved a completely new line with a completely new product—slacks and jacket that were designed with an athletic build specifically targeting a younger, more "hip" customer than the customers who purchased Plaintiff and Sears' other tailored clothing. While the launch of the New Structure Program was not without disputes between Plaintiff and Sears, by fall, 2004, Structure garments were stocked into two initial stores with good sales results and other stores were stocked with the Structure garments thereafter. By Thanksgiving, 2004, however, the sales numbers showed an unprecedented level of exchanges and returns on the Structure garments.

Plaintiff and Sears suspended manufacturing and shipping and investigated the possible cause for the Sears' customers' rejection of the Structure garments. Again, disputes regarding the investigation arose, but Plaintiff and Sears, both separately and together, performed a total of three audits of the Structure garments. Two of the three audits resulted in an unacceptable level of garments having measurements out of tolerance with the design specifications. The results of the final audit, performed at Plaintiff's request at Plaintiff's warehouse facility in Florida on March 29-31, 2005, indicated an acceptable number of garments that had measurements out of tolerance with the design specifications. As a result, Sears issued a "pass" result to Plaintiff on March 31, 2005.

While non-conformity to specifications did not appear to exist, the parties still had a failing garment program to address. Plaintiff and Sears did so through discussions and meetings from April to June, 2005. At the end of June, 2005, Plaintiff and Sears reached a business

2

resolution where Sears would purchase all of Plaintiff's manufactured garments and works in progress, once completed. Plaintiff would find other uses for any remaining fabric and trim (excluding any Structure trademarked items such as tags). Sears, believing the matter to be completely resolved, proceeded to take in garments, and Plaintiff proceeded to ship, finish, bill for and accept payment for the remaining Structure garments. At no time from December, 2004 through 2005, did Plaintiff ever accuse Sears of cancelling orders.

Approximately six months later, in January, 2006, Plaintiff contacted Sears again about the New Structure Program. Plaintiff had just been advised that it had not won the bid award on the 2006 Structure Program. Contrary to Sears' understanding of the 2005 business resolution, Plaintiff wanted Sears to address the remaining Structure Program raw materials. For the first time, Plaintiff claimed that Sears had cancelled orders dating back to 2004. Sears worked with Plaintiff to reach a business resolution.

In June, 2006, Robert Bayer, President of Plaintiff, sent an e-mail enumerating the details of the parties' 2006 agreement between Sears and Plaintiff: Plaintiff would make pants from the remaining materials and Sears would purchase the pants at a certain price over a certain timeframe. At no time during the discussions did Plaintiff advise Sears that it had any other issues with respect to the New Structure Program. Sears understood that the parties had completely resolved Plaintiff's remaining issues concerning the New Structure Program. Unbeknownst to Sears, however, Plaintiff was more interested in gaining leverage to obtain new guaranteed business from Sears than it was in complying with the pants deal.

When Plaintiff learned that its other tailored suit program with Sears—the David Taylor Program—was going to be wound down by the end of 2007-early 2008, and with no other Sears business in sight, Plaintiff told Sears that it would back out of the pants deal unless Sears also

paid Plaintiff $500,000. When Sears refused, Plaintiff sued, seeking nearly $2,000,000 in damages for alleged cancelled orders dating back to October, 2004.

## ARGUMENT

Plaintiff's single-count breach of contract complaint alleges two acts by Sears that constitute a "breach": (1) that Sears delayed shipment of units and (2) that Sears cancelled ordered units. (Complt. ¶ 25.) With respect to the first alleged act—delaying shipment of units—Plaintiff has not presented any evidence that any Sears' action caused Plaintiff any damages. (L. R. 56.1 Stmt ¶ 52.) Having failed to establish a requisite element to a breach of contract claim, Sears is entitled to summary judgment regarding any alleged delay of shipments as a matter of law. *See Heller Financial Leasing, Inc. v. Gordon*, 2005 U.S. Dist. LEXIS 24943, *5 (No. 03 C 6326 October 19, 2005) (elements of breach contract); *Echo, Inc. v. Whitson*, 121 F. 3d 1099, 1102-04 (7th Dist. 1997) (summary judgment proper where requisite elements of a breach of contract claim not established).

With respect to the second alleged act—cancelling ordered units—Plaintiff identifies five documents that it claims are "orders" obligating Sears to purchase all units set forth therein: (1) a February 19, 2004 Document; (2) a May 17, 2004 Document; (3) a June 9, 2004 Document; (4) an August 18, 2004 Document; and (5) an October 14, 2004 Document. (Complt. ¶ 13.) While Sears disputes that the February and August 2004 Documents are orders, the dispute is not a material one as Plaintiff bases its claim and damages on only a portion of the May 17, 2004 Document (which Sears agrees is an order) and a portion of the October 14, 2004 Document. (L.R. 56.1 Stmt ¶ 52.)

Plaintiff has failed to present any genuine issue of material fact in support of its breach of contract claim. First, Plaintiff has no evidence to defeat the express written terms that govern the

4

parties' agreement: Plaintiff, as manufacturer, agreed to take the risk of loss if it chose to proceed based on projections. Second, Plaintiff has no evidence that Sears actually cancelled anything—regardless of how the October 14, 2004 Document is characterized. The parties agreed to modify their respective obligations. Third, because Sears acted in reliance on the June, 2005 resolution, Plaintiff is estopped from after-the-fact asserting claims.

### A. Sears Is Entitled To Summary Judgment Because Plaintiff's Claim Is Based On A Projection For Which Plaintiff Accepted The Risk Of Loss.

Sears' Universal Terms and Conditions ("UTC") agreement signed by Plaintiff, governs all merchandise sold by Plaintiff, as manufacturing vendor, to Sears. (L.R. 56.1 Stmt ¶ 7.) The UTC expressly sets forth a provision relating to estimates and forecasts:

> Estimates or Forecasts – Any estimates or forecasts of Sears future needs for merchandise which may be provided to Seller by Sears are for long range planning purposes only and shall not in any way represent a commitment by Sears. *Sears shall have no responsibility for any actions taken by Seller based on such estimates or forecasts.*

(Ex. # 4 (emphasis added); L.R. 56.1 Stmt ¶ 8.)

"Estimate" and "Forecast" is undisputedly interchangeable with the term "Projection". (L.R. 56.1 Stmt. ¶ 9.) It is also undisputed that these terms "projection", "estimate," and "forecast" are used in contrast to the term "Order." (*Id.*) Thus, Plaintiff's claim based on a projection document cannot stand, as a matter of law based on the (1) express written terms, which (2) cannot be contradicted by extrinsic evidence.

### 1. Express Terms Place Risk Of Loss From Projections On Plaintiff.

Plaintiff cannot avoid the result of the plain terms of the UTC and the October 14, 2004 Document. Under the UTC, the definition of "Estimates or Forecasts," expressly provides that the risk of acting upon estimates is assigned to the vendor. (*Id.* ¶ 8.) This UTC provision cannot be modified absent a signed writing. (*Id.*) The October 14, 2004 Document expressly states the

5

document is a projection: "Item/SKU Projections." (*Id.* ¶ 23.) Plaintiff has provided no writing signed by both parties that modifies the UTC provision assigning to Plaintiff the risk of loss should Plaintiff choose to act based on a projections. Thus, under the express terms, Plaintiff's claim must fail.

The express terms—or rather, the absence thereof—also defeats Plaintiff's arguments that a signature and the level of detail transform the October 14, 2004 Document from a projection to an order. The October 14, 2004 document was signed by Sears' buyer, Mike Allen, and provides details regarding the garments Sears estimates it will purchase. (*Id.*) However, nowhere in the UTC does it state that a projection is no longer a projection if it is signed. Similarly, nowhere in the UTC does it limit the amount of detail that can be in a projection. No such limitations exist in the parties' written, agreed upon UTC. Contrary to any of Plaintiff's urgings, this Court should not add contractual terms into the UTC when the parties did not take the time to do so. *Accord, Regent Security Partners III, Ltd. v. Automatic Fire & Burglar Systems of St. Louis, Inc.*, 1991 U.S. Dist LEXIS 12782, *7-8 (No. 91 C 1667) (N.D. IL Sept. 10, 1991) (granting summary judgment where non-movant failed to explain why a "critical" condition was not included in the written agreement).

    **2.    The Illinois UCC Allows Established, Extrinsic Evidence To Supplement The Express Terms Of A Contract – Not To Contradict Terms – Thus, Plaintiff's Insufficient Evidence Is Improper.**

    **a. Inconsistent Extrinsic Evidence is Improper**

The Illinois Uniform Commercial Code (the "UCC"), which applies to this contract for the sale of goods, allows a court to consider evidence concerning course of performance, course of dealing, and usage of trade as an interpretative guide, but *only* when such evidence is reasonably consistent with the express terms of the contract. 810 Ill. Comp. Stat. §§ 5/2-208(2),

5/2-202; *Brooklyn Bagel Boys, Inc. v. Earthgrains Refrigerated Dough Prod., Inc.*, 212 F.3d 373, 380 (7th Cir. 2000) (affirming district court's decision to reject extrinsic evidence that was not consistent with the contract terms); *Advance Process Supply Co. v. Litton Industries Credit Corp.*, 745 F. 2d 1076, 1079-80 (7th Cir. 1984) (affirming district court's grant of summary judgment and rejection of proffered extrinsic evidence that contradicted express provision allocating risk).

In *Brooklyn Bagel Boys*, for example, the bagel seller sued Earthgrains for breach of contract, alleging that the parties had entered an exclusive requirements contract and that Earthgrains breached when it began manufacturing its own bagels. *Brooklyn Bagel Boys*, 212 F.3d at 376-77. The court granted summary judgment for the defendant, in great part, because the court rejected the bagel seller's attempts to introduce extrinsic evidence to prove that the defendant was obligated to purchase its requirements from only the bagel seller. Such evidence was inconsistent with the express contract terms. Even under the UCC, which allows such extrinsic evidence, extrinsic evidence is admissible only when it is reasonably consistent with the express contract terms. *Id.* at 380.

Similarly, in *Advance Process Supply*, the proffered extrinsic evidence would contradict, rather than explain, the express contract terms. 745 F.2d 1076, 1079-80. The plaintiff seller/guarantor of screen printing equipment sought a declaratory judgment that the defendant creditor, who had filed the faulty UCC filing, bore the risk of loss. The plaintiff offered evidence that course of dealing and trade usage established that the creditor bears the risk. However, the contract document explicitly placed the risk on the plaintiff. Thus, the district court properly rejected the proffered extrinsic evidence because it contradicted the express written risk of loss provision. *Id.*

7

Here, any attempt by Plaintiff to offer up extrinsic evidence to switch the risk of loss from plaintiff to Sears is directly contradictory to the UTC's risk of loss provision. Any attempt by Plaintiff asking the Court to ignore or delete the written term "Projections" on the October 14, 2004 Document is inconsistent with the explicit written document. Just as in *Brooklyn Bagel Boys* and *Advance Process*, any attempt to use extrinsic evidence to contradict the express terms of the parties' contract is properly rejected.

### b. Plaintiff Has Not Established Any Course of Dealing or Trade Usage

In addition, Plaintiff has not offered any sufficient documentary or oral testimony to establish course of dealing, course of performance or usage of trade whereby any signed document shifts the risk of loss by converting the document to an order. The record evidence establishes: (1) the October 14, 2004 Document was expressly titled "Projections"; (L.R. 56.1 Stmt. ¶ 23); (2) neither the buyer, Allen, nor Plaintiff's salesman, Leeseberg, changed or crossed out the document title; (*id.*); (3) Leeseberg, the salesman who handled the Sears accounts for Plaintiff and to whom the Sears buyer, Allen, gave the October 14, 2004 Document, admitted in deposition that he never advised Allen that by signing the October 14, 2004 Document, Plaintiff would consider, and Sears was agreeing, that the October 14, 2004 Document was an order; (*id.* ¶ 24.); (4) Leeseberg sent the October 14, 2004 Document internally to Plaintiff with a cover memo identifying the October 14, 2004 Document as "Signed Structure Projections"; (*id.*) and (5) according to Allan Zwerner, Plaintiff's own apparel industry witness, Mike Allen, as the Sears' buyer who was present and who signed the document, is more familiar regarding how the parties considered the October 14, 2004 document (*id.* ¶ 52.) Allen testified that far from being an order, the October 14, 2004 Document is an analyst worksheet, created by an entry level employee not even authorized to create an order. (*Id.* ¶ 24.) The document merely set forth Sears'

8

future needs as of October 14, 2004, which Allen signed both because Leeseberg asked him to, and in order to "verify with him that we had a collaborative session to discuss future needs in this program." (*Id*)

Just as in *Brooklyn Bagel Boys*, Plaintiff has simply failed in establishing any sufficient evidence of a course of dealing, course of performance or usage of trade. Summary judgment is therefore properly entered in favor of Sears.

### B. Sears Is Entitled To Summary Judgment Because Plaintiff Has No Evidence That Sears Cancelled Orders In Breach Of Any Agreement.

An additional basis for granting summary judgment in Sears' favor is the lack of evidence that Sears actually cancelled any orders. Plaintiff has produced no documents where Sears stated it was cancelling orders. When asked in deposition how or when Sears cancelled units, Plaintiff's witnesses either did not know or provided conflicting testimony. (Ex. # 6, Philip Looby Dep., 179:13-182:15; Ex. # 2, Robert Bayer Dep., 194:3-197:10; Ex. # 47, Robert Mills Dep., 47:15-48:10.)

The undisputed record evidence instead establishes that the parties worked together to resolve and wind down the unsuccessful 2004 Structure Program. (L.R. 56.1 Stmt. ¶¶ 27-40, 44-51.) The parties agreed to modify obligations (regardless of whether the October 14, 2004 document is characterized as an order or a projection) and proceeded to act in accordance with the agreed upon resolution. Such evidence defeats any claim of breach; it establishes an agreed contract modification. *See e.g. Cloud Corporation v. Hasbro, Inc.* 314 F.3d 289 (7th Cir. 2003); *see also generally 810 ILCS 5/2-209.*

#### 1. The Parties Agreed To And Investigated Problems With Product Line.

After the parties agreed in early December, 2004 to suspend shipments and manufacturing based on alarmingly high return and exchange rates, the parties investigated

possible causes. (L.R. 56.1 Stmt. ¶ 26-33.) At that time, Plaintiff did not identify Sears' actions as a breach. Plaintiff did not accuse Sears of cancelling orders. Plaintiff agreed the sales data was alarming and agreed that the parties should investigate. (*Id.* ¶ 26.) Sears and Plaintiff proceeded, both separately and together, with audits of the garments to first eliminate non-conformity with Sears' design specifications as a possible cause for the high rates of returns and exchanges. (*Id.* ¶ 26-33.)

The initial audit by Sears, conducted in-store in December, 2004, indicated an unacceptable number of measurements that were out of tolerance with the specifications. (*Id.* ¶ 27.) Sears immediately provided that information to Plaintiff. (*Id.*) Plaintiff did not identify Sears' actions at the time as a breach. Plaintiff did not accuse Sears of cancelling orders. Rather, Plaintiff took the information and had its own quality control expert perform an audit on Structure garments taken from the same stores in which Sears had measured garments. (*Id.* ¶ 28.) Plaintiff's audit results also indicated an unacceptable number of measurements that were out of tolerance, although Plaintiff did not provide Sears with these results. (*Id.*)

### 2. The Parties Agreed To Meet And Discuss Further Investigation.

In early January, 2005, both parties met at the Sears' Hoffman Estates headquarters and performed measuring audits of the garments over the course of three days. (*Id.* ¶ 29.) The results of the January, 2005 audit also reflected an unacceptable rate of measurements out of tolerance with specifications. (*Id.*) Plaintiff disputed the methodology and results of the January, 2005 audit and requested a meeting with Sears to discuss its dispute. (*Id.*) At that time, Plaintiff did not claim that Sears had cancelled orders or was otherwise in breach of its obligations.

Sears invited Plaintiff to perform all of the measuring and agreed to accept all garments Plaintiff found to be within specification tolerance. (*Id.* ¶ 30.) Plaintiff instead requested that an

additional audit be performed at its Florida distribution center utilizing Plaintiff's specialized tailoring methodology. (*Id.* ¶ 31.) Sears agreed and the results of the third audit indicated an acceptable level of garments within tolerance of the specifications. (*Id.* ¶ 32-33.) As a result, Sears issued a "pass" result to Plaintiff at the end of the March 29-31, 2005 audit. (*Id.* ¶ 33.) At that time, Plaintiff did not identify Sears' actions as a breach nor accuse Sears of cancelling orders.

### 3. The Parties Agreed To Modify Their Obligations And Wind Down The Unsuccessful Program.

After the March 29-31, 2005 audit, Sears and Plaintiff had numerous communications—phone calls, e-mails, and meetings—to discuss how the parties were going to proceed with the unsuccessful program. (*Id.* ¶ 34.) As was common for Sears and Plaintiff, as well as others in the apparel industry, the parties worked together to find a business resolution to wind down the unsuccessful program. (Ex. #31, pp17-18.) In June, 2005, the parties agreed that Sears would take in all garments manufactured by Plaintiff and all works in progress, once completed, which totaled 114,947 garments.[1] (L.R. 56.1 Stmt. ¶ 34.) (Ex. # 46, at ¶ 9.) Plaintiff would find other uses for any remaining fabric, excluding the trim that contained the trademark program name.

During these discussions, Plaintiff demanded a guarantee of continuing future business. (L.R. 56.1 Stmt. ¶36.) Sears, a publicly traded company, did not agree to guarantee an amount of future business, but did agree to ask Plaintiff to participate in the bid for the 2006 Structure Program and agreed to continue working with Plaintiff on another garment program, the David Taylor Program. (*Id.* ¶ 38.)

Shortly after the parties had agreed to a wind-down plan, Looby sent a letter to Allen stating that any agreed business resolution had to include future business opportunities (*Id.* ¶ 36.)

---

[1] Sears took in 41,550 pleated pants; 39,154 flat front pants; and 34,243 coats. (Ex. #46, at ¶ 9.)

11

It is undisputed that Sears requested Plaintiff to bid on the 2006 Structure Program and continued to use Plaintiff as its manufacturing vendor on another garment program through the end of 2007. (*Id.* ¶ 38.) Mike Allen believed that Sears had therefore satisfied this request of Plaintiff. (Ex. #18, pp. 218-19.) Plaintiff did not refuse to proceed with the agreed upon business resolution wind-down. Plaintiff never advised Sears that these Sears' actions did not satisfy Sears' obligations under the agreed upon business wind-down. Instead, Sears proceeded to take in all of the garments manufactured by Plaintiff and Plaintiff proceeded to ship, bill for and accept payment for the garments. (L.R. 56.1 Stmt. ¶ 37.) Based on this record evidence, Plaintiff has not and cannot establish breach; the parties modified their obligations. *See e.g. Cloud Corporation v. Hasbro, Inc.* 314 F.3d 289 (7th Cir. 2003). For this second, independent reason, Sears is entitled to summary judgment in its favor on Plaintiff's complaint.

### C. Sears Is Entitled To Summary Judgment Because Plaintiff Is Estopped From Now Claiming That Sears Cancelled Orders And It Was Damaged.

A third basis for granting Sears' motion for summary judgment is because Plaintiff should be estopped from claiming breach after Sears had relied upon and performed its end of the 2005 Resolution. To establish equitable estoppel under Illinois law, the party claiming estoppel must establish: that an "unjust effect" would result were the opposing party allowed to raise a claim inconsistent with its former statements, actions, or silence; that it did not know that the representations were untrue when they were acted upon; that the opposing party reasonably expected that it would act upon those representations; that it reasonably relied upon the representations in good faith and to its detriment; and, that it would be prejudiced by its reliance were the opposing party allowed to disavow the truth of its representations. *Geddes v. Mill Creek Country Club, Inc.* 751 N.E.2d 1150, 1157 (Ill. 2000); *LaSalle Nat'l Bank v. General Mills Restaurant Group, Inc.*, 854 F.2d 1050, 1053 (7th Cir. 1988) ("When a person apparently adopts

a position which reasonably misleads someone into detrimental reliance, that person can be estopped from avoiding that position, regardless of the intent of his actions, if to hold otherwise would have an unjust effect.") (internal quotations omitted) (citation omitted).

Here, after the 2005 Resolution, in late 2005 Sears informed Plaintiff that the David Taylor line would be reduced due to sluggish sales from 800 stores to the top 100 stores, plus the online store. (L.R. 56.1 Stmt. ¶ 39.) On January 18, 2006, Mike Allen called David Leeseberg to advise that Plaintiff had not been selected for the 2006 Structure Program because of price and product. (*Id.* ¶ 40.) Leeseberg sent Robert Bayer an email at 4:02 p.m. on January 18, 2006 advising Bayer that Sears had not selected Plaintiff as a vendor for the Fall 2006 Structure program. (*Id.*) By 4:48 p.m. on January 18, 2006, Plaintiff, through Phil Looby, contacted Sears to request a meeting to discuss the "Structure Raw Materails [sic] issues yet unresolved". (*Id.* ¶41). This was the first time in approximately six months that Plaintiff had contacted Allen regarding the unsuccessful Structure Program, excluding administrative/accounting issues. (*Id.*)

Sears was willing to and did discuss the matter with Plaintiff over the course of several months. (*Id.* ¶ 42.) On June 6, 2006, Bob Bayer, Plaintiff's President, sent an e-mail to Sears' VP, Mark Mettler, detailing the parties' agreement. (*Id.* ¶ 43.) Plaintiff would make pants to use up all of Plaintiff's remaining raw materials and Sears agreed to buy all pants at a stated price and within a stated timeframe. (*Id.*) Bayer knew Mettler would need the approval of Sears' legal department and that release language would be added to his e-mail. (*Id.* ¶ 44.) What Bayer did not tell Mettler, but did tell Looby in a contemporaneous e-mail, was "If I were there[sic] GC I would go for a broac general release, why not? If they do that, I will tell Mettler that we will refer to counsel, and let the attorneys discuss it. That way Carl will not agree to any language

13

that stands in the way of his broader purpose. This may well lead us to lose the pant order, but I am not prepared to give up the bigger issue at this point." (*Id.* ¶ 45.)

Sears sent back its confirmation of the parties' agreement, adding the expected release language. (*Id.* ¶ 46.) Bob Bayer did not respond until June 30, 2006, after being prompted by Mettler. Again, Bayer did not inform Mettler that he had not really been interested in reaching a final resolution; he was interested in trying to get negotiating advantage over Sears so that he could get something he did not have a contractual right to: guaranteed, new, future business. (*Id.* ¶ 49.)

In late, 2006, Sears notified Plaintiff that it's other Sears garment program—the David Taylor Program—would be wound down by the end of 2007-early 2008 due to poor sales. (*Id.* ¶ 50) On September 13, 2006, Plaintiff advised Sears that it would only proceed with the pants deal if Sears also paid Plaintiff $500,000. (*Id.* ¶ 49.) Sears refused and although there were additional discussions, Plaintiff never made the pants for Sears, and on May 1, 2007, Plaintiff filed suit seeking nearly $2,000,000 in damages for Sears' alleged cancellation of "ordered units" set forth in the October 14, 2004 Document. (*Id.* ¶ 51.)

Based on these undisputed facts, that Plaintiff's other programs with Sears later ended does not establish any genuine fact issue of a breach by Sears and Plaintiff should be estopped from claiming breach after the parties' modified their obligations. *See Geddes v. Mill Creek Country Club, Inc.* 751 N.E.2d 1150 (Ill. 2000) (Plaintiff equitably estopped ).

14

## CONCLUSION

The document upon which Plaintiff rests its $2,000,000 claim is clearly entitled "Projection". The Universal Terms and Conditions clearly identify that if Plaintiff decides to act on a projection, the risk of any loss is on Plaintiff. Plaintiff has not, through document nor deposition, presented any evidence requiring the Court to ignore these express written terms and to consider extrinsic evidence in direct contradiction to the written terms regarding risk of loss. In addition, and regardless of how the October 14, 2004 document is characterized, Plaintiff has not established an act of breach; that the parties agreed to modify the parties' obligations when the garment program proved unsuccessful does not establish that Sears breached any contract. Plaintiff is also equitably estopped from now claiming damages after the parties acted in reliance on the agreed modification.

WHEREFORE, Defendant Sears Roebuck and Co. is entitled to summary judgment in its favor on Plaintiff's complaint.

Dated: May 2, 2008

Respectfully Submitted,

Sears, Roebuck and Co.

s/ Michele Sibley Gonzales
By: One of its Attorneys

Michele Sibley Gonzales (ARDC # 6226091)
Maureen E. Browne (ARDC #625283)
Holland and Knight LLP
131 South Dearborn Street
Suite 3000
Chicago, IL 60603
(312) 263-3600

# 5309243_v6

## **CERTIFICATE OF SERVICE**

I, Michele Sibley Gonzales, hereby certify that I caused copies of the foregoing: Defendant Sears Roebuck and Co.'s Memorandum in Support of its Motion for Summary Judgment, served on this day, May 2, 2008, upon counsel-of-record listed below via email pursuant to the agreement of the parties.

Daniel M. Feeney
Roger J. Perlstadt
MILLER SHAKMAN & BEEM LLP
180 N. LaSalle Street, Suite 3600
Chicago, Illinois 60601
(312) 263-3700
dfeebey@millershakman.com
rperlstadt@millershakman.com

David Marcus
Ryan Kirkpatrick
Dennis Sobczak
SUSMAN GODFREY LLP
1901 Avenue of the Americas, Suite 950
Los Angeles, California 90067-6029
(310) 789-3100
dmarcus@susmangodfrey.com
rkirkpatrick@susmangodfrey.com
dsobczak@susmangodrey.com

            /s/ Michele Sibley Gonzales
            Michele Sibley Gonzales

# 5027857_v1