UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BAYER CLOTHING GROUP, INC. | ) | |
| | ) | |
| Plaintiff, | ) | 07CV2395 |
| | ) | JUDGE DER-YEGHIAYAN |
| v. | ) | MAG. JUDGE BROWN |
| | ) | |
| SEARS, ROEBUCK and CO. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant. | ) | |

**DEFENDANT SEARS, ROEBUCK and CO.'S
STATEMENT OF FACTS PURSUANT TO LOCAL RULE 56.1**

Defendant, Sears, Roebuck and Co. ("Sears") states the following as there statement of material facts, pursuant to Local Rule 56.1, in support of its Motion for Summary Judgment.

**Parties, Jurisdiction and Venue**

1. Plaintiff Bayer Clothing Group, Inc. ("Plaintiff") is a corporation organized and existing under the laws of the State of Pennsylvania, with its principal place of business at 8912 Clearfield-Curwensville Highway, Clearfield, Pennsylvania 16830. (Ex. #1, Answer to Complaint, at ¶ 1.).

2. Defendant Sears is a corporation organized and existing under the laws of the State of New York, with its principal place of business at 3333 Beverly Road, Hoffman Estates, Illinois 60179. (Ex. #1, Answer to Complaint, at ¶ 2.).

3. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because Plaintiff and Defendant are citizens of different states and the matter in controversy exceeds the sum or value of $75,000. (Ex. #1, Answer to Complaint, at ¶ 3.).

4. Venue is appropriate pursuant to 28 U.S.C. §§ 1391 (a) and (c) because Sears has its principal place of business in this district. Venue is further appropriate as both Sears and Bayer have contractually submitted to the venue and jurisdiction of the federal and/or state courts of Illinois. (Ex. #1, Answer to Complaint, at ¶ 4.).

## Undisputed Material Facts

5. Plaintiff is a clothing manufacturer of men's tailored clothing and has served as a vendor to Sears. (Ex. #1, Answer to Complaint, at ¶ 5; Ex. #2, Robert Bayer Dep., 8:11-16.).

6. As of 2003, Sears and Plaintiff had been business partners for many years on various endeavors and Plaintiff was currently serving as vendor for Sears on a long-running suit program, the David Taylor Suit Program ("David Taylor"). (Ex. #3, David Leeseberg Dep., 22:10–24:16; Ex. #2, Robert Bayer Dep., 150:1-4.)

7. As part of the business relationship, on March 1, 1996, Sears and Plaintiff signed a contract entitled "Sears, Roebuck and Co. Universal Terms and Conditions," ("UTC"), which was applicable to all sales of merchandise from Plaintiff to Sears. (Ex. #4, UTC.)

8. The UTC expressly sets forth a provision relating to estimates and forecasts:

> ESTIMATES OR FORECASTS – Any estimates or forecasts of Sears future needs for Merchandise which may be provided to Seller by Sears are for long range planning purposes only and shall not in any way represent a commitment of Sears. *Sears shall have no responsibility for any actions taken by Seller based on such estimates or forecasts.*

(Ex. #4, UTC, at ¶ 6) (emphasis added).

2

9. The term "projection" is used interchangeably with the terms "estimate" and "forecast". (Ex. # 5, Allan Zwerner Dep., 42:2-5; David Leeseberg Dep., 74:4-8, 177:17-24. *See also* Ex. #3; Robert Bayer Dep., Ex. #2, 67:10-68:20). These terms—projection, estimate or forecast—are used in contrast to the term "order". (Ex. #5, Allan Zwerner Dep., 78:9-12. *See also* Ex. #2, Robert Bayer Dep., 22:3-23:3.)

10. The UTC further provides that "no right of either party under [the] Agreement may be waived except as expressly set forth in a writing signed by the party waiving". (Ex. #4, UTC, at p.3.) The UTC may only be amended or modified by a signed written document. (*Id.*)

11. In late 2003, Sears advised Plaintiff that it had been selected as the vendor on a new Sears' program involving a new product that was to roll out in fall 2004: the Structure Suit Separates Program ("New Structure Program"). (Ex. #1, Answer to Complaint, at ¶ 7.)

12. Plaintiff has not produced any document that exempts from the provisions of the UTC Plaintiff's sales of merchandise under the New Structure Program. (Ex. #2, Robert Bayer Dep., 14:13-17; Ex. #6, Philip Looby Dep., 48:6-9.)

13. The New Structure Program was focused on bringing a younger, more "hip", customer into the Sears' stores. Toward that end, Sears selected Plaintiff to manufacture a suit jacket and slacks that were designed for a younger, more athletic build. (Ex. #7, Susan Sisk Dep., 19:1-13.)

14. On February 19, 2004, the Sears' buyer for the New Structure Program, Jeff Budd, provided Plaintiff's sales representative, David Leeseberg, a document that set forth certain units of goods for the New Structure Program (the "February 19, 2004 Document"). (Ex.

3

#8, February 19, 2004 Document.) The February 19, 2004 Document was signed by Jeff Budd. (*Id.*) An internal BCG memorandum from David Leeseberg refers to the February 19, 2004 Document as an "order." (Ex. #9, February 23, 2004 Hyde memo from Leeseberg to Bayer.

15. Days after signing the February 19, 2004 Document, Jeff Budd left Sears and Mike Allen was thereafter assigned as the Sears' buyer on the New Structure Program. (Ex. #9, February 23, 2004 Hyde memo from Leeseberg to Bayer.)

16. On March 1, 2004, Allen spoke with Leeseberg and Bayer concerning the status of the New Structure Program, which was due to roll out into stores in the Fall, 2004. (Ex.# 10, March 1, 2004 email from Robert Bayer.) After this discussion with, Bayer sent an email to Chief Operating Officer Phil Looby and BCG employee Tom Iacocca advising them of the phone call. (*Id.*) In Bayer's March 1, 2004 email, titled "Sears Structures Cancellation," Bayer stated that Sears cancelled certain orders relating to the New Structure Program.

17. On May 17, 2004, Sears' associate buyer for the New Structure Program, Jim Struck, provided Leeseberg a document ("May 17, 2004 Document") which set forth orders for approximately the same number of units as did the February 19, 2004 Document but altered the garment mix. (Ex. #11, May 17, 2004 Document.) The May 17, 2004 Document specified shipping dates ranging from August through November, 2004. (*Id.*) Sears and Plaintiff agree that the May 17, 2004 Document is an order for the stated number of garments. (Ex. # 3, David Leeseberg Dep., 117:4-9.)

18. On June 9, 2004, Jim Struck provided to David Leeseberg a document dated June 9, 2004, ("June 9, 2004 Document") which, in one column, set forth additional Structure units to be shipped in December, 2004. (Ex. #12, June 9, 2004 Document.) Both Sears and Plaintiff

4

agree that this first column in the June 9, 2004 Document is an order for the stated number of garments. (Ex. # 13, James Struck Dep., 46:17-48:15.)

19. The June 9, 2004 Document also included two additional columns separated from the first column, one entitled "S05," and one entitled "REP". No shipping dates were provided for these columns. (Ex. #12, June 9, 2004 Document.)

20. The handwritten notation on the June 2004 Document, made and initialed by Jim Struck, reads: "Est for Spring 05". (Ex. #12, June 9, 2004 Document.) On June 9, 2004, Leeseberg circulated the June 9, 2004 Document internally at BCG and referred to units as set forth on the June 2004 Document as "Spring '05 Structures estimates". (Ex. #14, June 9, 2004 internal BCG memo from Leeseberg.)

21. On August 18, 2004, Struck provided to Leeseberg a document ("August 18, 2004 Document") that consisted of two boxes and was entitled "Hyde Clothing Spring '05 Estimate". (Ex. #15, August 18, 2004 document.) The August 18, 2004 Document contains no prices or delivery dates. (*Id.*)

22. By August, 2004, the first garments were in the first two Sears' stores. (Ex. # 13, James Struck Dep., 83:10-20.) Certain other stores were stocked with the new Structure garments thereafter. (Ex. # 13, James Struck Dep., 75: 1-5.)

23. On October 14, 2004, Sears buyer Mike Allen provided to Leeseberg a document entitled "Structure Suit Jackets Item/SKU Projections," ("October 14, 2004 Document"). (Ex. #16, October 14, 2004 document.) The October 14, 2004 Document sets forth information regarding Structure units and is signed by Mike Allen. (*Id.*)

5

24. Leeseberg sent an internal BCG memorandum attaching the October 14, 2004 Document and referring to it as "Signed Structure Projections". (Ex. #17, October 14, 2004, BCG memo to Cindy Triponey from Leeseberg.) Leeseberg never told Allen that by signing the October 14, 2004 Document, Plaintiff would consider and Sears would be agreeing that the October 14, 2004 Document was an order. (Ex. #3, David Leeseberg Dep.,164:1-8; Ex. #18, Mike Allen Dep., 114:19-116:15.)

25. In late Fall 2004, Sears sales data on the New Structure Program showed an alarmingly high rate of returns and exchanges. Sears gave the data to Plaintiff and began discussing the issue with Plaintiff. (Ex. #19, December 12, 2004 letter from Robert Bayer to Michael Allen regarding Structure's garments; Ex. #2, Robert Bayer Dep., 87:21-89:21.)

26. On December 8, 2004 Mike Allen suggested that Plaintiff halt production of Structure units until the parties could investigate the return and exchange rates. (Ex. #19, December 12, 2004 letter from Robert Bayer to Mike Allen.) Plaintiff was also very concerned with the high return and exchange rates and agreed to halt production and investigate, as stated in Robert Bayer's December 12, 2004 letter to Mike Allen. (*Id.*)

27. Between December 22 and December 28, 2004, Sears performed an initial one-day, in-store audit on the Structure garments. (Exh. #7, Susan Sisk Dep., 78:2-80:21; Ex. #20, December 30, 2004 email from Struck regarding Structure suit measurements (Ex. #21, December 22, 2004 email from Pamela Nutt regarding measuring Structure garments.) The initial audit results showed an unacceptable number of measurements that were out of tolerance with the design specifications. (Ex. #20, December 30, 2004 email from Struck regarding Structure suit measurements.) Immediately after the in-store audit, on December 30, 2004,

6

Sears shared the audit results with Plaintiff. (Ex. #20, December 30, 2004 email from Struck regarding Structure suit measurements.)

28. At the same time, Plaintiff had its quality control expert, Jim Murphy, perform an audit of Structure garments in Chicago. (Ex. #22, January 4, 2005 email from Jim Murphy to Robert Bayer regarding Chicago visit.) The garments tested by Jim Murphy were pulled from the same stores that Sears was testing garments in. (*Id.*) The results of Jim Murphy's audit in Chicago, which showed that approximately 15 garments out of 98 tested had defects, were not shared with Sears. (Ex. #7, Susan Sisk Dep., 218:14-21; Ex. #22, January 4, 2005 email from Jim Murphy to Robert Bayer regarding Chicago visit.

29. Subsequent to the initial in-store audit, Plaintiff and Sears agreed to further investigate by conducting another audit at Sears' Hoffman Estates headquarters on January 5-7, 2005. (Ex. #23, January 10-11, 2005, email string attaching measurement results from January 5-7 audit at Hoffman Estates; Ex. #7, Susan Sisk Dep., 11:21-12:3; Ex. #2, Robert Bayer Dep., 95:23-96:18.) During these three days of meetings, additional Structure garments from other Sears' stores were measured at Sears' Hoffman Estates headquarters, with Plaintiff's Quality Assurance expert, Jim Murphy, performing the measuring. (Ex. #7, Susan Sisk Dep., 117:7-118:20.) The results of this January, 2005 audit indicated an unacceptably high rate of measurements out of tolerance with the specifications for the Structure garments. (Ex. #23, January 10-11, 2005, email string attaching measurement results from January 5-7 audit at Hoffman Estates. Plaintiff disputed the results and the measuring methods. (Ex. #24, February 10, 2005 email from Robert Bayer to Paul Jones regarding January audit.

30. Shortly after the January 2005 audit at Sears' Hoffman Estates headquarters, the parties continued to discuss how to come to a resolution with respect to the Structure garments. On January 18, 2005, Mike Allen suggested to Leeseberg that Plaintiff consider allowing Sears to ship all of the Structure garments that were currently in the Sears stores back to Plaintiff so that Plaintiff could measure these garments and simultaneously ship all garments that are in tolerance back to Sears to start replenishing the stores. (Ex. #25, January 18, 2005 email from Leeseberg to Bayer regarding his phone conversation with Mike Allen. Plaintiff rejected this proposal.

31. On January 20, 2005, per Sears' suggestion to Plaintiff that they provide Sears with a proposal for conducting a third audit, Plaintiff provided Sears with a method for auditing Structure garments at Plaintiff's Macclenny, Florida distribution center. (Ex. #26, January 20, 2005 email from Leeseberg to Mike Allen regarding proposal for examining Structure products; Ex. #27, January 20, 2005 email from Leeseberg to Bayer regarding Structure audit proposal.

32. Sears accepted Plaintiff's proposal for examining the Structures garments in Macclenny and acted on it. (Ex. #6, Phil Looby Dep., 132:7-13, 136:11-14; Ex. #29, March 8, 2005 email from Bayer to Jim Murphy regarding measuring proposal to be used at the March 29-31, 2005 audit. A third audit was conducted on March 29-31, 2005 at Plaintiff's distribution center in Macclenny. (Ex. #1, Answer to Compl. at ¶ 17; Ex. #6, Phil Looby Dep. 136:11-21; Ex. #28, April 2, 2005 letter from Philip Looby to Paul Jones regarding results of the third audit.

33. The results of the March 29-31 audit indicated that while certain garments were out of tolerance with specifications, the number of such instances was below the required level. (Ex. #30, Inspection Report from March 29-31, 2005 audit. Sears therefore issued a "pass" result

8

to Plaintiff and Plaintiff and Sears agreed to meet to further discuss next steps. (Ex. #30, Inspection Report from March 29-31, 2005 audit. (Ex. #7, Susan Sisk Dep., 169:1-8.)

34. From April through June, 2005, Plaintiff and Sears worked to determine how to proceed with the new Structure Program. (Ex. #2, Robert Bayer Dep., 125:17-140:7; Ex. #31, Expert Report of Antonio Sarabia II, at pp.15-16, Exhibit D). Ultimately, these discussions proceeded favorably, and resulted in an understanding in which Sears would accept all finished goods inventory and later purchase the remaining raw material fabric in the form of pants. (Ex. #2, Robert Bayer Dep., 135:3-18; Ex. #32, May 13, 2005 internal BCG email from Robert Bayer regarding pants proposal.)

35. On June 30, 2005, Sears sent an email to Robert Bayer setting forth the proposed acceptance schedule, or "ladder plans," for Sears' acceptance of the remaining finished Structures goods and works in process. (Ex. # 33, June 30-July 8, 2005 email string regarding the ladder plan. Mike Allen forwarded this same email to Plaintiff's COO, Phil Looby, on July 8, 2005. (*Id.*)

36. Looby responded to Mike Allen that same day, asserting in part that Plaintiff's "participation" in working to come to a resolution with respect to the New Structure Program was conditioned on "a firm committed continuing relationship". (*Id.*) Looby recognized in his response that Allen was unable "to speak to the continuation of the 'non-Structure' tailored business". (*Id.*)

37. Based upon these discussions, Sears began to issue purchase orders for the Structure garments, Plaintiff began shipping and billing Sears for the Structure garments, and Sears took in and paid for all Structure garments that Plaintiff had completed, plus all works in

9

progress, once completed (Ex. #2, Robert Bayer Dep., 159:22-160:1). Between July 1, 2005 and March 30, 2006, Sears took in and paid for approximately 82,000 Structure garments shipped by Plaintiff. (Ex. # 1, Answer to Compl., at ¶ 19.)

38.     During the summer of 2005, Sears also requested that Plaintiff bid for the 2006 Structure Program. (Ex. #3, David Leeseberg Dep., 213:19-216:21. Additionally, Sears continued to use Plaintiff for the 2006-2007 David Taylor Program. (Ex. #2, Robert Bayer Dep., 150:1-4; Ex.# 6, Phil Looby Dep., 168:12-15).

39.     In late 2005 Sears informed Plaintiff that the David Taylor line would be reduced from 800 stores to the top 100 stores, plus the online store. (Ex. #34, Mark Mettler Dep., 166:24-167:13).

40.     On January 18, 2006, Mike Allen called David Leeseberg to advise that Plaintiff had not been selected for the 2006 Structure Program. (Ex. #35; January 18, 2006, email from Leeseberg to Robert Bayer; Ex. #18, Mike Allen Dep., 218:7-16; Ex. #3, David Leeseberg Dep., 214:12-215:7.) Leeseberg sent Robert Bayer an email at 4:02 p.m. on that same day advising Bayer that he had just received word from Allen that Plaintiff had not been selected as a vendor for the Fall 2006 Structure Program. (Ex. #35, January 18, 2006, email from Leeseberg to Robert Bayer.)

41.     Less than an hour later, at 4:48 p.m. on January 18, 2006, Plaintiff, through Phil Looby, contacted Sears to request a meeting to discuss the "Structure Raw Materails [sic] issues yet unresolved". (Ex. #36, January 18, 2006 email from Looby to Les Townsend regarding raw materials issues. Until this time, Plaintiff had not contacted or advised Sears of any Structure Program issues for roughly six months. (Ex. #18, Michael Allen Dep., 219:5-17).

42. Sears again agreed to discuss the matter with Plaintiff, and from January through June of 2006, Sears and Plaintiff representatives discussed the raw material issue. (Ex.# 36, January 18, 2006 email from Looby to Les Townsend regarding raw material status; Ex. #37, March 1, 2006 email from Looby to Mettler regarding structure raw materials liability.)

43. On June 6, 2006, Robert Bayer sent to Sears' Vice President Mark Mettler an email summarizing the parties' agreement with respect to the raw materials. (Ex. #39, June 6, 2006 email from Robert Bayer to Mark Mettler. Plaintiff's summary of the agreement specifically stated that Sears would purchase enough pants – roughly 38,000–from Plaintiff to consume all of the remaining fabric, and much of the trim, from the Structure program. (*Id.*) Plaintiff's summary of the agreement further stated that upon shipment and Sears' payment for the pants, Plaintiff would assume responsibility for any other raw materials. (*Id.*)

44. Bayer concluded his June 6, 2006, summary as such: "You told me yesterday that you are awaiting 'language' from your legal department with respect to a description of the mutual agreements underlying this proposed order. We await receipt of this language, and will comment at that time as necessary." (*Id.*)

45. But just prior to sending the June 6, 2006, summary to Mark Mettler, Robert Bayer had sent an internal e-mail to his COO, Phil Looby, which stated that if the negotiations with Mettler went "beyond fabric to a general release, we have a problem. . . . This may well lead us to lose the pant order. But I am not prepared to give up the bigger issue at this point". (Ex. #40, June 5, 2006 email from Robert Bayer to Phil Looby regarding Mettler's comments.

11

46. Mettler responded to Bayer's June 6, 2006 email on June 13, 2006. (Ex. #41, June 13, 2006 email from Mark Mettler to Robert Bayer. Mr. Mettler's June 13 response retained substantially the same language as Bayer's June 6 summary, adding only release language. (*Id.*)

47. On June 28, 2006, Mettler sent Robert Bayer an email inquiring whether the June 6, 2006, agreement was moving forward such that the parties could meet Plaintiff's desire to have all pants shipped and paid for by the end of 2006. (Ex. #42, June 28-30, 2006 email string between Mettler and Bayer regarding the fabric/trim resolution.)

48. Two days later, on June 30, 2006, responding to Mettler's June 28 email, Robert Bayer wrote: "[s]ince the Sears legal team is now involved in this matter and you are effectively asking for a full release, the situation is a bit more complicated." (*Id.*) Bayer concluded by informing Mettler that Plaintiff would be now seeking counsel on the matter. (*Id.*)

49. On September 13, 2006, Plaintiff shifted its position again, with Phil Looby writing Mettler to demand that in addition to purchasing the 38,000 pants by the end of 2006, Sears pay Plaintiff an additional $500,000 "in the spirit of fairness and partnership." (Ex. #43, September 13, 2006, letter from Looby to Mettler regarding additional $500,000 payment. Although there were additional discussions between the parties, Plaintiff never made the pants for Sears. (Ex. #2, Robert Bayer Dep., 168:23-169:1; Ex. #38, Les Townsend Dep., 64:11-65:6.)

50. Between August and November of 2006, Sears informed Plaintiff that it would be winding down the David Taylor program. (Ex. # 34, Mark Mettler Dep., 166:24-168:3).

51. On May 1, 2007, Plaintiff filed its complaint claiming that Sears had breached the contract by "cancelling" 69,063 units and seeking $1.89 million in damages. (Ex. #1, Answer to

12

Compl. at ¶¶ 25, 27; Ex. # 44, October 11, 2006 letter from Looby to Mettler providing summary of BCG losses totaling $1.89 million.

52. Written and oral discovery has been completed, including the production of expert reports. Plaintiff has retained Allan Zwerner as its apparel industry expert, and Robert Mills as its damages expert, both of whom have prepared reports. (Ex. #45, Allan Zwerner Expert Report; Ex. #46, Robert Mills Expert Report.) Zwerner testified in deposition that the Sears buyer [Mike Allen] is more familiar concerning how the parties approached the October 14, 2004 Document than the [Sears Vice President ]. (Ex. #5, Allan Zwerner Dep., 94:3-95:11.) Neither Zwerner nor Mills hold opinions regarding damages incurred as a result of any alleged delay in shipping. (Ex. #47, Robert Mills Dep., 45:14-49:10; Ex. #5, Allan Zwerner Dep. 243:11-244:15, 199:10-201:11.) With respect to damages for any alleged cancellation of orders, Mills considers only a portion of the May 17, 2004 Document and a portion of the October 14, 2004 Document. (Ex. #46, Robert Mills Expert Report, at Exhibit 4-A.)

53. Sears has retained Antonio Sarabia as its apparel industry expert. Mr. Sarabia has produced a written report. (Ex. #31, Expert Report of Antonio R. Sarabia II.) Sears has also retained Louis Dudney as its damages expert. Mr. Dudney has produced a written report. (Ex. #48, Expert Report of Louis G. Dudney, CPA.)

Respectfully submitted,

SEARS, ROEBUCK and CO.

By: /s/ Michele Sibley Gonzales
One of their Attorneys

14

Michele Sibley Gonzales (ARDC #6226091)
Maureen E. Browne (ARDC #6282583)
Holland & Knight LLP
131 South Dearborn Street, 30th Floor
Chicago, IL 60603
(312) 263-3600
michele.sibleygonzales@hklaw.com
maureen.browne@hklaw.com

# 5305522_v1

**CERTIFICATE OF SERVICE**

I, Michele Sibley Gonzales, hereby certify that I caused copies of the foregoing: Defendant Sears, Roebuck and Co.'s Statement of Facts Pursuant to Local Rule 56.1 served on this day, May 2, 2008, upon counsel-of-record listed below via email pursuant to the agreement of the parties.

Daniel M. Feeney
Roger J. Perlstadt
MILLER SHAKMAN & BEEM LLP
180 N. LaSalle Street, Suite 3600
Chicago, Illinois 60601
(312) 263-3700
dfeebey@millershakman.com
rperlstadt@millershakman.com

David Marcus
Ryan Kirkpatrick
Dennis Sobczak
SUSMAN GODFREY LLP
1901 Avenue of the Americas, Suite 950
Los Angeles, California 90067-6029
(310) 789-3100
dmarcus@susmangodfrey.com
rkirkpatrick@susmangodfrey.com
dsobczak@susmangodrey.com

/s/ Michele Sibley Gonzales
Michele Sibley Gonzales

# 5027857_v1